2012 UT 67

**In the Matter of the Discipline
of Nathan N. Jardine**

**UTAH STATE BAR, Plaintiff
and Appellee,**

v.

**Nathan N. JARDINE, Defendant
and Appellant.**

**No. 20100600.**

Supreme Court of Utah.

Oct. 2, 2012.

Billy L. Walker, Adam C. Bevis, Salt Lake City, for appellee.

Nathan N. Jardine, Salt Lake City, pro se.

Associate Chief Justice NEHRING, opinion of the Court.

## INTRODUCTION

¶ 1 Nathan Jardine was suspended from the practice of law for three years following a panoply of alleged violations of the Rules of Professional Conduct. After reviewing the alleged violations, we determined that the more appropriate sanction was a suspension for eighteen months. We issued an order modifying the duration of his suspension. This opinion explains our reasoning.

## BACKGROUND

¶ 2 On the advice of the Office of Professional Conduct (OPC), the district court ruled that Mr. Jardine violated ethical rules in his dealings with four clients. To make OPC's allegations more understandable, we will segment our description and analysis of Mr. Jardine's alleged misdeeds by the four clients that he allegedly victimized.

### I. MILDRED GARDNER

¶ 3 One of Mr. Jardine's former employees, Kelli Hatch, approached Mr. Jardine about representing her friend, an elderly woman named Mildred Gardner. Ms. Gardner was being harassed by her son, David. She wanted to disinherit David and sought Mr. Jardine's aid in this endeavor. Ms. Hatch asked Mr. Jardine if he would revise Ms. Gardner's estate plan and work to prevent the harassment from David. Mr. Jardine told Ms. Hatch that he did not do estate planning work and referred her to another attorney. Ms. Hatch relayed this message to Ms. Gardner, but nevertheless Ms. Gardner decided she wanted to hire Mr. Jardine to represent her.

¶ 4 Ms. Hatch wrote a note on a notepad. Ms. Gardner signed the handwritten note, which read

> I Mildred Gardner by this statement and my check for the amount of $5,000.00, do hereby retain Mr. Nathan Jardine of Jardine law offices for services associated with or regarding my personal financial matters. I understand that this retainer is non-refundable. I understand that Mr. Jardine is accommodating my physical limitations at this time and I hereby agree to meet with him formally as soon as I am feeling better. I understand that Mr. Jardine will have me a sign a more formal fee agreement or retainer contract at that time which will reflect the same terms stated herein above.

¶ 5 Mr. Jardine accepted this note as a preliminary fee agreement and deposited Ms. Gardner's $5,000 nonrefundable retainer into his operating account.

¶ 6 Mr. Jardine scheduled appointments with Ms. Gardner, but she was unable to attend them because of her frail health. He did not go to her home to meet with her until March 2006, four months after he was retained. He did not meet with anyone in her family to assess her capacity or learn about her finances. He did, however, attempt to stop David's harassment. He was also available to Ms. Gardner, should she call, and, in Mr. Jardine's words, he provided her with "peace of mind."

¶ 7 Mr. Jardine was given two letters, signed by Ms. Gardner. One authorized Mr. Jardine to give $9,000 to Paula Ashby for her son's tuition. The other authorized Ms. Ashby to withdraw funds for her own rent from Ms. Gardner's bank accounts. Mr. Jardine never inquired into the authenticity of these authorizations. In December 2005, Ms. Gardner authorized Mr. Jardine to release information and discuss all financial matters with Ms. Ashby, Mildred Hutchinson, and Stuart Clark. Mr. Jardine did not meet with these people.

¶ 8 In March and April 2006, a representative of JP Morgan Chase Bank notified Mr. Jardine that Ms. Gardner's accounts with the bank were being drained. Around that same time, a representative from Zions Bank contacted Ms. Ashby to discuss the losses from Ms. Gardner's accounts. Ms. Ashby referred the Zions Bank representative to Mr. Jardine. Ms. Ashby later pled guilty to Attempted Abuse/Neglect/Exploitation of a Vulnerable Adult in relation to misappropriating $140,000 from Ms. Gardner's accounts.

¶ 9 About this time, Ms. Gardner was adjudicated to be incompetent. An attorney was appointed to assist her. That attorney asked Mr. Jardine to return the retainer. Mr. Jardine returned $2,000 of the $5,000 retainer. He kept $3,000 for work he had performed and for making himself available to her.

¶ 10 OPC contended, and the district court agreed, that Mr. Jardine's actions in the Gardner Matter violated the following Rules of Professional Conduct: rule 1.2(a) (Scope of Representation); rule 1.4(a) (Communication); rule 1.4(b) (Communication); rule 1.5(a) (Fees); rule 1.15(a), (c) and (d) (Safekeeping Property).

## II. SUSAN MECHAM

¶ 11 Susan Mecham was charged with aggravated kidnaping, a first-degree felony. Her husband was the complaining witness. When charged, she was also in the midst of divorce proceedings. She hired Mr. Jardine to represent her in both the criminal and divorce proceedings. During the course of representation, a protective order was entered against Ms. Mecham. Mr. Jardine agreed to represent her in that matter as well.

¶ 12 Mr. Jardine charged Ms. Mecham $10,000. The signed fee agreement described this as a "non-refundable retainer." The controversial paragraph states, with emphasis in the original,

> In order to induce Attorney to accept the above-referenced representation, work and employment, Client ... agrees to post a non-refundable retainer of $10,000. Said retainer is earned at the moment Client signs this contract. The parties agree that **THIS RETAINER IS NON-REFUNDABLE**; however, the retainer may be refunded if attorney materially breaches this agreement. Nevertheless, Attorney has earned this retainer, and Client has paid this retainer for the following consideration: 1) Attorney has accepted this case; 2) Attorney has promised to do the work described herein; and 3) Attorney has reserved the time necessary to do the work described herein; Client agrees not to ask that the retainer be refunded. Client further agrees that said money belongs to Attorney and need not be deposited into his trust account, but shall be deposited into his operating account and that said funds shall be used for Attorney's immediate use and benefit. All future monies paid by Client to Attorney are also in the nature of a non-refundable retainer as described in this paragraph. Client agrees that should Client's total bill amount to more than $10,000 Client will pay Attorney for all amounts over and above said amount billed to client....

Another paragraph explained that,

> Client agrees that the length of time attorney is retained is determined by the amount of work Attorney is required to do. To that end, Attorney is retained until he has worked a certain number of hours for client depending on the amount of retainer paid. When Attorney has worked the prescribed number of hours, he is no longer obligated to do any work for client until he receives another retainer from client; if Attorney does not receive another retainer he may withdraw from representing client

as long as client's interests will not be prejudiced. In the event that Attorney continues with the representation, client agrees to pay for Attorney's time at [$150 per hour for each hour billed by Nathan N. Jardine and $25 to $85 per hour for each hour billed by paralegal].

¶ 13 Susan Mecham initialed next to a paragraph that states, also with the emphasis in the original,

By Client's initials to the left of this paragraph, client acknowledges that his/her understanding **that the retainer is a nonrefundable retainer**, that he/ she has read this document, and that he/she has received a copy of this document.

¶ 14 Mr. Jardine accepted Ms. Mecham's fee agreement and $10,000 nonrefundable retainer. Consistent with the contract, he deposited the money in his operating account, not his trust account. He never sent Ms. Mecham a monthly billing statement.

¶ 15 During the course of representation, Mr. Jardine traveled five times from Salt Lake City, Utah, where he lived, to Vernal, Utah, where Ms. Mecham lived, for court appearances. That trip takes approximately three hours each way. Mr. Jardine prepared for the court appearances, prepared and filed a Motion for Temporary Alimony, and reviewed a four-inch-thick stack of documents in connection with the divorce matter. In Ms. Mecham's criminal matter, Mr. Jardine persuaded the prosecuting attorney to file an amended information reducing the first-degree felony to a third-degree felony in exchange for Ms. Mecham's plea of guilty and agreement to waive her preliminary hearing. In Ms. Mecham's divorce matter, Mr. Jardine prevented her from testifying at any hearings so that she would not give conflicting testimony in her criminal matter. He also obtained $5,000 for her.

¶ 16 At some point during the representation, Ms. Mecham became dissatisfied with Mr. Jardine and hired another attorney. In September 2006, Ms. Mecham's new attorney sent a letter to Mr. Jardine asking for Ms. Mecham's file. Mr. Jardine did not respond. In December 2006, Ms. Mecham's new attorney again sent a letter to Mr. Jardine asking for the file. In January 2007, Mr. Jardine's secretary sent Ms. Mecham's criminal and divorce files to the new attorney, but inadvertently included the file and personal information of another client without that client's consent. After OPC began investigating Mr. Jardine's representation of Ms. Mecham, Mr. Jardine compiled a report of the time he spent working on Ms. Mecham's case. He prepared an exhibit showing that, at his usual rate of $150 per hour, he would have charged Ms. Mecham $13,500 if he had billed her on an hourly basis.

¶ 17 OPC contended, and the district court agreed, that these actions violated the following Rules of Professional Conduct: rule 1.5(a) (Fees); rule 1.6(a) (Confidentiality of Information); rule 1.15(a), (c) and (d) (Safekeeping Property); and rule 1.16(d) (Declining or Terminating Representation). Mr. Jardine agrees that he violated rule 1.16(d) (Declining or Terminating Representation).

## III. JORIE LOOMIS

¶ 18 Jorie Loomis was arrested by the Utah Highway Patrol (UHP) because the UHP officer incorrectly believed that Mr. Loomis was driving with a suspended license. Mr. Loomis hired Mr. Jardine to file a lawsuit against UHP for wrongful arrest. In April 2001, Mr. Jardine sent a demand letter to UHP claiming that the case was worth $100,000. Mr. Jardine sent Mr. Loomis a copy of this letter. In May 2002, Mr. Jardine filed a complaint, but did not serve UHP within 120 days as required by the Utah Rules of Civil Procedure. Two years later, in April 2004, Mr. Jardine moved to dismiss the complaint and then refiled it within three days. When Mr. Jardine refiled the complaint, he served it on the UHP office in Salt Lake City; he should have instead served it on the UHP office in Heber City, Utah. The UHP office in Salt Lake did not respond to the lawsuit so Mr. Jardine attempted to enter default against UHP. The Attorney General appeared and moved to quash the summons and dismiss the case because process had been served on UHP at the wrong location. Mr. Jardine agreed with the Attorney General that he had served UHP at the wrong office. He anticipated that the dis-

trict court would dismiss the case so that he could refile and reserve the case, this time on the UHP office in Heber City. The district court issued an order to show cause for failure to prosecute the case. When neither the parties nor their attorney appeared for the hearing on the order to show cause, the district court dismissed the case in June 2006. At this point, Mr. Jardine refiled the complaint. But Mr. Loomis had complained to the Utah State Bar and was in the process of discharging Mr. Jardine as his attorney. During the entire six years of representation, Mr. Jardine rarely communicated with Mr. Loomis, and when he did, it was mostly to tell Mr. Loomis to keep waiting.

¶ 19 OPC contended, and the district court agreed, that this conduct violated the following Rules of Professional Conduct: rule 1.1 (Competence); rule 1.3 (Diligence); and rule 1.4(a) (Communication). Mr. Jardine agrees that he violated rule 1.3 (Diligence).

### IV. KEVIN WOODS

¶ 20 Kevin Woods was charged with two DUIs. He hired Mr. Jardine to represent him. Mr. Jardine's secretary incorrectly informed Mr. Jardine that the date for the pretrial conference and jury trial had been changed. Accordingly, neither Mr. Jardine nor Mr. Woods appeared. Mr. Jardine spent the day working in his office.

¶ 21 The prosecution's witnesses also failed to appear that day. The parties could not reach a plea deal and the matter had to be continued. The justice court judge, Judge Virginia Ward, did not try to contact Mr. Jardine that day. Instead, she issued a bench warrant for Mr. Woods and personally sent a letter to OPC complaining that Mr. Jardine had impeded justice. She asserted that Mr. Woods's interests were not well served because he was deprived of the opportunity for a favorable plea deal and the matter had to be continued.

¶ 22 OPC contended, and the district court agreed, that this conduct violated rule 8.4(d) of the Rules of Professional Conduct (Misconduct).

**1.** *In re Discipline of Babilis,* 951 P.2d 207, 213 (Utah 1997).

### V. DISCIPLINARY HEARING AND SANCTION

¶ 23 The district court found that Mr. Jardine violated all of the above-mentioned rules. It also found that he violated rule 8.4(a) (Misconduct) because he had violated other Rules of Professional Conduct.

¶ 24 The district court held a sanctions hearing to consider aggravating and mitigating circumstances as enumerated in rule 14–607 of the Supreme Court Rules of Professional Practice. The district court found the following aggravating factors: a prior record of discipline, multiple offenses, a pattern of misconduct, refusal to acknowledge the wrongful nature of the misconduct involved, vulnerability of the victims, selfish or dishonest motive, substantial experience in the practice of law, and a lack of any good faith efforts to make restitution or rectify the consequences of the misconduct.

¶ 25 The district court agreed with OPC that a three-year suspension from the practice of law was appropriate. Mr. Jardine appeals this order of the district court. We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(c).

### STANDARD OF REVIEW

¶ 26 Article VIII, section 4 of the Utah Constitution states, "the Supreme Court by rule shall govern the practice of law, including admission to practice law and the conduct and discipline of persons admitted to practice law." "[A] district court finds the facts and enters an order of discipline that is a final order unless appealed."[1] "[W]e will ordinarily presume findings of fact to be correct and will not overturn them unless they are arbitrary, capricious, or plainly in error."[2] "Nevertheless, in light of our constitutional mandate and the unique nature of disciplinary actions and our knowledge of the nature of the practice of law, we accord less deference to the findings of a

**2.** *Id.* (internal quotation marks omitted).

lower tribunal." [3] We "reserve the right to draw inferences from basic facts which may differ from the inferences drawn by the lower tribunal." [4] "Although we recognize as a general proposition the district court's advantaged position in overall familiarity with the evidence and the context of the case, on appeal we must treat the ultimate determination of discipline as our responsibility." [5] "In sum, this Court will ordinarily presume that the [lower tribunal's] findings of fact are correct, although we may set those findings aside if they are not supported by the evidence. If the evidence warrants, we may make an independent judgment regarding the appropriate level of discipline . . . ." [6]

## ANALYSIS

¶ 27 We begin with the general framework governing the discipline of lawyers. Rule 14–602 of the Supreme Court Rules of Professional Practice states,

> The purpose of imposing lawyer sanctions is to ensure and maintain the high standard of professional conduct required of those who undertake the discharge of professional responsibilities as lawyers, and to protect the public and the administration of justice from lawyers who have demonstrated by their conduct that they are unable or likely to be unable to discharge properly their professional responsibilities. [7]

¶ 28 "A disciplinary sanction is imposed on a lawyer upon a finding or acknowledgment that the lawyer has engaged in professional misconduct." [8] The highest possible sanction is disbarment. [9] The next highest possible sanction is suspension. [10] "Suspension is the removal of a lawyer from the practice of law for a specified minimum period of time," between six months and three

years. [11] Suspension is generally appropriate when a lawyer "knowingly engages in professional misconduct . . . and causes injury or potential injury to a party, the public, or the legal system, or causes interference or potential interference with a legal proceeding." [12] When determining what sanction is appropriate after a finding of lawyer misconduct, we consider the following factors: "(a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors [established in rule 14–607]." [13] With this framework in mind, we turn to the individual allegations of misconduct levied against Mr. Jardine.

## I. ALLEGED MISCONDUCT

### A. Rule 1.5 (Fees)

¶ 29 Rule 1.5(a) of the Utah Rules of Professional Conduct states that "[a] lawyer shall not make an agreement for, charge or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:"

(a)(1) the time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly;

(a)(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(a)(3) the fee customarily charged in the locality for similar legal services;

(a)(4) the amount involved and the results obtained;

---

3. *Id.* (internal quotation marks omitted).

4. *Id.* (alterations omitted) (internal quotation marks omitted).

5. *Id.*

6. *Id.* (alteration in original) (internal quotation marks omitted).

7. Sᴜᴘ. Cᴛ. R. Pʀᴏꜰ'ʟ Pʀᴀᴄᴛɪᴄᴇ 14–602(b).

8. *Id.* 14–603(a).

9. *See id.* 14–603(b).

10. *See id.* 14–603(c).

11. *Id.*

12. *Id.* 14–605(b)(1).

13. *Id.* 14–604.

(a)(5) the time limitations imposed by the client or by the circumstances;

(a)(6) the nature and length of the professional relationship with the client;

(a)(7) the experience, reputation and ability of the lawyer or lawyers performing the services; and

(a)(8) whether the fee is fixed or contingent.[14]

These factors do not represent an exclusive list, and each factor may not be relevant in every case.[15]

### 1. Gardner Matter

¶ 30 The district court determined that Mr. Jardine violated rule 1.5 in the Gardner Matter because he collected $5,000 from Ms. Gardner and "did nothing on her case and failed to perform any meaningful legal services." Mr. Jardine first notes, and we acknowledge, that he charged Ms. Gardner $5,000 but refunded $2,000—for a net gain of $3,000. Thus, the amount under scrutiny is $3,000, not $5,000.

¶ 31 Mr. Jardine also disagrees with the district court's conclusion that he "did nothing." He concedes that he did not keep track of his time, but attributes this to the nature of a nonrefundable agreement. In his brief to this court, he lists thirteen services he provided Ms. Gardner: (i) talked to David Gardner twice and stopped him from harassing his mother; (ii) met with Kelli Hatch to assume representation; (iii) received various documents into the file; (iv) reviewed Ms. Gardner's current will and trust documents in anticipation of revising them; (v) made three or four appointments for Mildred Gardner to come into the office; (vi) spoke with a bank representative; (vii) went to visit Mildred Gardner and talked to her about her assets and heirs; (viii) had telephone conversations with Ms. Gardner's roommate, Lee; (ix) set up a file; (x) had three or four telephone conversations with Ms. Gardner; (xi) had six telephone conversations with Kelli Hatch; (xii) had conversations with police officers; and (xiii) gave Mildred Gardner peace of mind.

¶ 32 Mr. Jardine asserts that "the major result that was obtained through the six months of representation in this matter was the peace of mind that Mildred Gardner received." He contends that she received this peace of mind in two ways: first, David Gardner stopped harassing her, and second, "Mildred Gardner knew that she could call Mr. Jardine at any time to talk to her about her legal issues and on at least four occasions she availed herself of that privilege." He concludes, "the peace of mind given to Mildred Gardner was worth $500 a month for six months."

¶ 33 Our review of the record discloses that this account markedly revises Mr. Jardine's testimony to the district court. The record indicates that he agreed to represent Ms. Gardner on December 23, 2005. On December 27, 2005, he received and filed an authorization to release information and discuss Ms. Gardner's business matters with Paula Ashby, Stewart Clark and Mildred Lee Hutchison. In his words, "[t]his [was] an authorization as I understand it. It [didn't] direct me to do anything. It authorized me to talk to various people . . . about [Ms. Gardner]'s financial matters." He also received a document authorizing various individuals to maintain all of Ms. Gardner's holdings, household and financial needs, and another one "reliev[ing] Paula Ashby and her mother and her brother from any kind of lawsuit that might come up arising .out of their handling [Ms. Gardner's] financial affairs." But Mr. Jardine never spoke with Ms. Gardner about these documents. He explained, "I wasn't helping her with her financial affairs. I was helping her with her will and estate planning." When pressed that the handwritten agreement said "financial affairs," Mr. Jardine defended himself,

I wasn't helping her with her . . . personal financial affairs. I didn't draft that portion of the agreement. Mildred was going to come in at a later time and we were going to tie down exactly what I was going to do for her, but my understanding from talking to Kelli Hatch was that I was supposed to look at her will and her trust

---

**14.** Utah R. Prof'l Conduct 1.5(a).

**15.** *Id.* 1.5 cmt. 1.

documents and help revise those documents once we'd ascertained how much—which and where her assets were.

It's also my understanding that she was in poor health at the time and that she was going to need some time to gather that information before we could actually go forward with that. It was not my understanding that I was supposed to be taking care of her from anything anybody was doing to her. I wanted to have a conversation with Mildred about that. We set three or four appointments for her to come into the office so we could talk about that. She didn't ever come in. I eventually went out to her house to talk about that, but when I went out to talk to her about it, she was—she had been involved in an accident. She had an injury and she was on some pain medicine and it just wasn't an appropriate time to talk about that right there. So I wanted to. I tried to, but I couldn't get the communication from her regarding that particular thing that I needed.

¶ 34 That meeting occurred on or after March 31, 2006, after a bank representative contacted Mr. Jardine and explained that Ms. Gardner's accounts were being drained. In the months before that, he did very little on Ms. Gardner's case. After being asked "during December, January, February and March you didn't do anything on Mildred Gardner's case, did you?" Mr. Jardine responded,

I don't think that's accurate. I think that there were calls that were fielded that I talked to them. I think there were documents that were assembled. We were in the process of preparing, getting ready to find out what her assets were so we could do her estate and wills work that we had talked about earlier. I also believe that Mildred—that perhaps Lee had called from her home on a few occasions to talk to me about the problem that they were having with David Gardner ... so I think that I did some work and I was available for her—I was available to talk to Mildred, as I indicated, but I don't have any—because of the nature of the nonrefundable retainer agreement and because of the nature of how things were I didn't keep time

records so to speak of what I actually did at that time although I do know that I did some things.

¶ 35 He later gave this accounting of his work on Ms. Gardner's case,

Q: On the ... Gardner matter, how many times did you talk to Mildred Gardner?

A: Probably three or four times and one time over at her house, I'm guessing. I know that I talked to her at least one time at her house. I don't think it was twice, but at least once.

Q: How many times on the telephone?

A: Probably three or four times, I'm guessing.

Q: Do you recall how long you were at the house?

A: About an hour.

Q: Travel time? How much travel time?

A: About 15 minutes there and 15 minutes back.

Q: Any additional time?

A: There were other documents that were sent and other phone calls that were received. Once, again, the real weakness to what I was doing in her case is that I didn't take a—I wasn't keeping track of my time on a regular basis and it's impossible for me at this juncture to really recollect how much extra time was spent, but there was a will as part of these materials, there was a trust that was part of these materials and there were other letters and other documents that were part of these materials that I reviewed as well.

Q: How many calls did you have from Ms. Hatch?

Q: (From the Court)

I'm sorry. I didn't catch you—did you say that you reviewed or did you draft?

A: I didn't draft them. I reviewed them. I looked at them. I read them when they came in.

. . . .

Q: How many phone calls or conversations did you have with Ms. Hatch?

A: Probably more I would say. Probably in the neighborhood of about six probably.

Q: How many times did you talk with Brent Robbins?

A: Just once.

Q: On the phone only?

A: Yes.

Q: Did you have any other conversations with any other bank people?

A: No, but I did have a conversation with David Gardner or two conversations with him.

Q: Did you have conversations with any police officers?

A: Yes, I did.

Q: How many?

A: A couple of different times I talked to the police.

Q: Did you have conversations with Lee Hutchison?

A: I think that there may have been a couple with Lee Hutchison.

Q: How about with Paula Ashby?

A: I only recall talking to her one time in person. Really she just introduced me to Mildred Gardner when I went to the house that one time.

Q: In view of that time involvement, do you feel like your fee was reasonable at $3,000?

A: I felt like I should have refunded probably $4,000 of the $5,000 that she gave me based on what I can justify just right now. I know that there was some peace of mind that Mildred Gardner got associated with the fact that I came on board and was willing to be there whenever she wanted to call me, but if I had my way and I had had the same thing happen this time, I would have given her back $4,000 instead of the $2,000 that I gave back.

¶ 36 In his brief to this court, Mr. Jardine retreated from his position that he should have refunded $4,000 instead of $2,000:

Mr. Jardine expressed a belief that he should have refunded more of the retainer, but that belief was expressed after these proceedings were brought with 20/20 hindsight of the tremendous time involved in defending this matter in comparison to the amount of money retained. Prior to the time these proceedings were brought Mr. Jardine thought that he had complied with Opinion 136 [of the Utah State Bar Ethics Advisory Opinion Committee [16]] by refunding forty percent of the retainer. As indicated, above, under the pressure of the proceeding, and considering the fact that he might lose his license to practice law, Mr. Jardine said that he should have returned more of the retainer.

¶ 37 We evaluate these facts against the factors outlined in rule 1.5. First, there was little time and labor required, the questions presented were not novel or difficult, and no specialized legal skill was required to perform the legal service properly. Second, there is no evidence that the acceptance of the particular employment precluded other employment. Third, there is no evidence about the fee customarily charged in the locality for similar services, but we note that Mr. Jardine indicated in his contract with Ms. Mecham that his hourly rate (after the nonrefundable retainer was earned) was $150. Fourth, the amount involved was $3,000 and the primary result obtained was "peace of mind." Fifth, there is no evidence that any time limitations were explicitly imposed by the client or circumstances, although it seems to us that revising the will and trust of an eighty-seven-year-old woman in frail health imposes some inherent pressure to act promptly. Sixth, this was the beginning of Mr. Jardine's relationship with Ms. Gardner. Seventh, there is evidence that Mr. Jardine had practiced for seventeen or eighteen years, but there was no other statement as to his experience, reputation, or ability. Eighth, the fee was fixed.

¶ 38 Considering these factors, only the fourth and fifth merit further discussion. Under factor (a)(4), we consider the amount involved and the result obtained. Under factor (a)(5), we consider the time limitations imposed by the client or by the circumstances. Mr. Jardine contends that the pri-

16. *See* Utah State Bar Ethics Advisory Op. 136 (July 29, 1993).

mary result obtained was peace of mind, and that the amount involved corresponds to the peace of mind obtained. In short, Mr. Jardine contends that the results obtained justified the amount involved, and OPC disagrees.

¶ 39 "Peace of mind" is an amorphous concept, and it is difficult for us to measure and value. We therefore step back to consider the situation in its entirety. In this case, we find it significant that Mr. Jardine was asked to review the will and trust of an elderly woman in poor health. It seems to us that this is a matter that should not have been delayed. And when other documents arrived at Mr. Jardine's office, purporting to give various people access to his client's accounts, Mr. Jardine should have started to wonder what exactly was expected of him. Under factor (a)(5), Mr. Jardine might have been justified in charging a higher fee if he made Ms. Gardner's case his highest priority. But he did the opposite. He accepted Ms. Gardner's $5,000 and waited until she was healthy enough to meet with him. Of course, given that he was revising an eighty-seven-year-old woman's will and trust, waiting until she was healthy was not a prudent course of action. And although he had several conversations with people and reviewed documents, all of these actions were in preparation for the work he was hired to do—revise Ms. Gardner's will and trust. We recognize that lawyers must often spend a great deal of time preparing before they can actually accomplish a task, and that they deserve to be paid for their time. But where Mr. Jardine's entire representation consisted of preparing to revise Ms. Gardner's will and trust, and he delayed work which was so obviously time sensitive, we cannot conclude that the "peace of mind" provided to Ms. Gardner was worth $500 a month for six months. We therefore agree with the district court's conclusion that Mr. Jardine's fee was excessive under rule 1.5.

■ ¶ 40 Mr. Jardine also argues that, even if the fee was excessive, he should not be penalized because he justifiably relied on Opinion 136 of the Utah State Bar Ethics Advisory Opinion Committee (Opinion 136). Rule 14–504(d) speaks to this point: "The OPC shall not prosecute a Utah lawyer for any act that was expressly approved by an ethics advisory opinion that has not been withdrawn at the time of the conduct in question." That rule also notes that "[n]o court is bound by an ethics opinion's interpretation of the Utah Rules of Professional Conduct." [17] Attorneys who seek to anchor within the safe harbor of an ethics advisory opinion bear the responsibility to be certain that the opinion upon which they rely is congruent with the rules of professional conduct. In this case, Opinion 136 has not been expressly withdrawn, but it was written before the current version of rule 1.5 was promulgated. Thus, even if Opinion 136 provided Mr. Jardine a safe harbor, he would be able to seek its refuge only if his misconduct "was expressly approved." We conclude it was not.

¶ 41 Mr. Jardine relies on this portion of Opinion 136:

> If a substantial "nonrefundable retainer" which is in part a prepaid fee is paid to an attorney and, before the attorney performs any service under the contract, the client dies, or fires the attorney, or the services called for by the contract are no longer needed for some other reason, would the attorney be guilty of charging a clearly excessive fee ... if he refused to refund any of the "nonrefundable retainer"?
>
> . . . .
>
> Such a lawyer might, but would not necessarily be, guilty of charging an excessive fee .... If the lawyer performs no legal services, obtains no benefits for the client and has not lost other employment opportunities as a result of agreeing to represent the client, we believe he might well be guilty of charging an excessive fee if he refused to refund part of it[.] [18]

¶ 42 Mr. Jardine argues that his behavior is expressly approved by this language on two grounds: (1) he provided Ms. Gardner *some* legal services and (2) he refunded *some* of the money. But Opinion 136 itself under-

---

**17.** Sᴜᴘ. Cᴛ R. Pʀᴏꜰ'ʟ Pʀᴀᴄᴛɪᴄᴇ 14–504(d).

**18.** *See* Utah State Bar Ethics Advisory Op. 136 (July 29, 1993) (citing *Bain v. Weiffenbach*, 590 So.2d 544 (Fla.App.1991)).

mines Mr. Jardine's argument. The Opinion warns, "[w]e do not believe that, by designating a retainer as 'nonrefundable,' a lawyer automatically insulates himself from a claim that the fee is excessive."[19] To explain, the Opinion states,

> [a] designation of a fee as "nonrefundable" can, of course, never supersede the requirements of Rule 1.5, which proscribe excessive or unreasonable fees, and Rule 1.14, which requires the return of unearned fees. Thus, the term "nonrefundable" really is a misnomer; such fees are more appropriately termed "fixed fees."[20]

The Opinion offers certain contexts in which a fixed fee is reasonable. For example,

> a lawyer of towering reputation, just by agreeing to represent a client, may cause a threatened lawsuit to vanish and thereby obtain a substantial benefit for the client and be entitled to keep the entire amount paid to him, particularly if he had lost or declined other employment in order to represent that particular client.[21]

Other examples include occasions in which "a lawyer's commitment to be available has value in and of itself," or when "an attorney's acceptance of a matter, even for a short while, may, on conflicts grounds, disqualify the attorney and his firm from accepting other matters."[22] In these situations, "[a] fixed-fee agreement . . . compensates the attorney in part for accepting that conflict."[23] The Opinion concludes, "whether a fixed-fee agreement is clearly excessive depends on whether the total fee meets the standards set out in Rule 1.5 and not on whether any part of it is treated in the fee agreement as nonrefundable."[24]

¶ 43 Thus, there is not a categorical ban on fixed-fee arrangements, and whether a given fee arrangement is justified is a question to be answered on a case-by-case basis. Mr. Jardine has not demonstrated that his fixed fee was justified in the Gardner Matter and he therefore cannot find sanctuary in the language of Opinion 136. We affirm the district court's conclusion that Mr. Jardine violated rule 1.5 in the Gardner Matter.

2. Mecham Matter

¶ 44 The district court determined that Mr. Jardine also violated rule 1.5 in the Mecham Matter. The district court wrote,

> Mr. Jardine charged Ms. Mecham $10,000 to represent her in criminal and divorce proceedings. Mr. Jardine's Fee Agreement did not reasonably articulate how the $10,000 was to be earned. Mr. Jardine did not perform services that would total $10,000. During the representation, Ms. Mecham did not receive a single billing statement as to Mr. Jardine's services reflecting the amount of work done on the cases.

Of these statements, the only one that is relevant to whether Mr. Jardine's fee was excessive is the statement that he "did not perform services that would total $10,000." But there are no findings of fact to support this conclusion. Indeed, there are no findings of fact at all concerning Mr. Jardine's fee in the Mecham Matter. We therefore consider the record evidence ourselves.

¶ 45 In the course of Mr. Jardine's representation of Ms. Mecham, he prepared for, traveled to, and attended five court conferences in Vernal, Utah—a six-hour round trip drive from Salt Lake City. He had multiple telephone conferences with his client. He persuaded the prosecutor to reduce the first-degree felony charge to a third-degree felony charge. He filed a motion for temporary alimony and obtained $5,000 for Ms. Mecham. He also prevented her from testifying so as to avoid any potentially conflicting testimony. In a billing statement generated after Mr. Jardine's representation had been terminated, he concluded that he had worked 90.35 hours on Ms. Mecham's case. He also had advanced $146.28 in costs on her case. Mr. Jardine's customary hourly rate was $150. Mr. Jardine thus concluded [ (90.35 ×

19. *Id.* (internal quotation marks omitted).

20. *Id.*

21. *Id.* (internal quotation marks omitted).

22. *Id.*

23. *Id.*

24. *Id.*

150) + 146.28] that the work he had done for Ms. Mecham was worth $13,698.78.

¶ 46 The district court made no findings of fact that contradict Mr. Jardine's accounting statement, and thus the conclusion of law reached by the district court is supported by neither the findings of fact nor the evidence. A district court "must apply the correct law to its findings of fact, and its findings of fact must be supported by sufficient evidence." [25] Our own review of the record suggests that Mr. Jardine's fee was not excessive. We thus conclude that the district court erred in determining that Mr. Jardine violated rule 1.5 in the Mecham Matter.

### B. Rule 1.15 (Safekeeping Property)

¶ 47 Rule 1.15 of the Rules of Professional Conduct explains that a lawyer should keep his money separate from his client's money. This rule is sometimes referred to as the "commingling" rule. To guide lawyers in keeping accounts separate, rule 1.15 outlines the appropriate procedure for safekeeping a client's property. The portions relevant to Mr. Jardine's case state,

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. . . .

. . . .

(c) A lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred.

(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. . . . [A] lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property. . . . [26]

¶ 48 In both the Mecham and the Gardner Matters, Mr. Jardine collected a fee at the beginning of the representation. He called it a "non-refundable retainer" and deposited it directly into his operating account, instead of his client trust account. In the Mecham Matter, he clearly explained his intentions in an Attorney–Client Fee Contract, but did not get that opportunity in the Gardner Matter.

¶ 49 Mr. Jardine first argues that nonrefundable retainers are beneficial to both the client and the lawyer and should thus be encouraged. We see this policy argument as irrelevant; the question is simply whether he violated rule 1.15. He also contends that his actions were consistent with the statement in Opinion 136 that a nonrefundable retainer, or a part of one, "is considered earned upon payment, [and] it may be deposited into the attorney's general operating account rather than in his trust account." Like rule 1.5, rule 1.15 postdates Opinion 136. Mr. Jardine would therefore only be able to seek refuge in Opinion 136 if his conduct was "expressly approved." [27] But Mr. Jardine misinterprets Opinion 136.

¶ 50 Rule 1.15(c) and Opinion 136 overlap on this important point: money may be deposited into a lawyer's operating account *after it is earned.* In most cases, a lawyer will withdraw money from the client trust account after having performed some work, frequently in proportion to his hourly rate. And, as recognized by Opinion 136, there are occasionally situations in which money is earned even if little or no work is performed: situations where a lawyer of towering reputation provides a benefit just by agreeing to represent a client, or if the lawyer's commitment to be available has value in and of itself, or when, by accepting representation, the lawyer is disqualified from other representation.[28] In those situations, money may actually be *earned* at the time the lawyer accepts the representation. The difficult question, of course, is to determine when the money is earned.

25. *Askew v. Hardman,* 918 P.2d 469, 472 (Utah 1996).

26. Utah R. Prof'l Conduct 1.15.

27. *See supra* ¶ 40.

28. *See supra* ¶ 42.

¶ 51 At some instant in the course of a lawsuit, deposited funds transition from being a retainer to being earned. It is the attorney's responsibility to apply sound judgment and fairness in determining when this transition occurs. But in every case, the lawyer may not deposit the funds into his personal operating account until the money is earned. And if the lawyer must later defend his debits against a Bar complaint, it is his obligation to demonstrate that the money was earned before it was withdrawn, whether that happened at the moment the lawyer agreed to representation, or after many hours of work were performed.

¶ 52 Here, Mr. Jardine would have us use Opinion 136 to circumvent the requirement that the money must be earned. The sentence in particular that best supports Mr. Jardine's position states that, when a fixed-fee agreement is permissible, it should "clearly set forth (a) what portion of the retainer is considered to be nonrefundable, (b) that nonrefundability is conditioned on the absence of default by the lawyer, and (c) what circumstances may entitle the client to a disgorgement of all or part of the 'nonrefundable' amount."[29] Mr. Jardine argues that all of these criteria were met in his contract with Ms. Mecham and his verbal agreement with Ms. Hatch: the contract explained that 100 percent of the retainer was considered nonrefundable unless Mr. Jardine breached the contract and explained what circumstances would entitle the client to a disgorgement of all or part of the nonrefundable amount. Thus, he would have us conclude that the deposited funds were, as defined by the contract, "earned upon receipt."

¶ 53 The weakness in Mr. Jardine's argument is that the guidelines of Opinion 136 support, not supplant, the fundamental requirement that the money must be earned before it is withdrawn. Mr. Jardine has not provided us with any reason to believe that the Gardner Matter or the Mecham Matter were of the type that would cause money to be earned upon receipt. He has not demonstrated that he provided a substantial benefit for his client by virtue of having a "towering

reputation," that his commitment to be available had value in and of itself beyond the usual attorney/client relationship, that his acceptance of the matters disqualified him from accepting other matters, or any similar exception to the general rule. He has tried to argue that he gave Ms. Gardner "peace of mind" at a rate of $500 per month, but we have considered and rejected this in the context of rule 1.5.[30] We likewise find unpersuasive the "peace of mind" defense to a violation of rule 1.15. We therefore conclude that, his Attorney–Client Fee Contract notwithstanding, Mr. Jardine had not earned the money before he deposited it into his operating account. We affirm the district court's conclusion that he violated rule 1.15 in both the Gardner and the Mecham Matters.

### C. Other Violations in the Gardner Matter

¶ 54 In addition to the violations outlined above, the district court concluded that Mr. Jardine violated rules 1.2 and 1.4 in the Gardner Matter.

1. Rule 1.2 (Scope of Representation and Allocation of Authority Between Client and Lawyer)

¶ 55 Rule 1.2(a) states,

[A] lawyer shall abide by a client's decisions concerning the objectives of representation and ... shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter....

¶ 56 The district court determined that Mr. Jardine violated this rule because he "made no independent assessment of the mental capacity of Ms. Gardner [and] did not meet with his client for three months after accepting $5,000 to assist her with her finances and estate." The district court concluded, "Mr. Jardine did nothing to determine what Ms. Gardner's assets were or to protect them during his representation."

29. Utah State Bar Ethics Advisory Op. 136 (July 29, 1993).

30. *See supra* ¶ 39.

¶ 57 Mr. Jardine responds that his "agreement" with Ms. Gardner was an informal, temporary arrangement. The handwritten note written by Kelli Hatch and signed by Ms. Gardner stated that Mr. Jardine was hired "for services associated with or regarding [Ms. Gardner's] personal financial matters." However, any understanding he had about the scope of representation came from his communications with Ms. Hatch, and he believed that he had been hired to assist with Ms. Gardner's will and trust—not the entirety of her personal finances. The note further stated that "Mr. Jardine is accommodating my physical limitations at this time and I hereby agree to meet with him formally as soon as I am feeling better. I understand that Mr. Jardine will have me sign a more formal agreement or retainer contract at that time." Mr. Jardine made several appointments with Ms. Gardner, which she was unable to keep due to her frail health.

¶ 58 We conclude it was unreasonable for Mr. Jardine to delay defining the scope of representation with Ms. Gardner. She was elderly and in poor health, and she had asked him to assist her with her personal financial affairs, including revising her will and trust. Under these circumstances, it was important to act expeditiously. Having agreed to represent her, and having taken her money, he was obligated to take action, at least to the extent of defining with her what she needed him to do. We thus affirm the district court's conclusion that Mr. Jardine violated rule 1.2.

2. Rule 1.4 (Communication)

¶ 59 Rule 1.4 states that a lawyer shall

(a)(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent . . . is required by these Rules;

(a)(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;

(a)(3) keep the client reasonably informed about the status of the matter;

(a)(4) promptly comply with reasonable requests for information; and

(a)(5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

¶ 60 The district court determined that Mr. Jardine violated both subsections (a) and (b) because he failed to meet with Ms. Gardner for three months or communicate with her about her financial situation. We agree with the district court that Mr. Jardine did not communicate with Ms. Gardner, but that misconduct falls in the purview of rule 1.2, discussed *supra*. Given that the scope of representation was ill-defined, Mr. Jardine had nothing to communicate to Ms. Gardner, other than to try to establish an initial relationship. Mr. Jardine attempted to communicate with Ms. Gardner, but she was unavailable. Any harm that came from his failure to communicate with her is actually attributable to his failure to define the scope of his representation—if Mr. Jardine and Ms. Gardner had different expectations of his representation, that difference resulted from a failure to define the representation, not from a failure to communicate. To say that he also violated rule 1.4 is an attempt to punish him twice for the same misconduct. We therefore conclude that the district court erred when it determined that Mr. Jardine violated rule 1.4 in the Gardner Matter.

## D. Other Violations in the Mecham Matter

¶ 61 The district court concluded that Mr. Jardine violated rules 1.6(a) (Confidentiality of Information) and 1.16(d) (Declining or Terminating Representation) in the Mecham Matter. Mr. Jardine concedes that he violated rule 1.16(d), and we need address this issue no further.

¶ 62 Rule 1.6(a) states, "[a] lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is [reason-

ably necessary to accomplish one of an enumerated list of goals.]"

¶ 63 The district court determined that Mr. Jardine violated rule 1.6(a) "[b]y failing to supervise his staff adequately" when his secretary inadvertently mailed another client's records to Ms. Mecham. "As the person responsible for maintaining the confidentiality of client records Mr. Jardine failed to protect those records and disclosed confidential information of another client without the other client's consent."

¶ 64 Nothing in rule 1.6 states that an employee's misconduct is imputed to the lawyer. The policies underlying the Rules of Professional Conduct are directed toward the behavior *of the lawyer.* It is true that a lawyer has some responsibility for the professional misconduct of his employees, but those responsibilities are defined by rule 5.3.[31] Because the error of Mr. Jardine's secretary cannot be imputed to Mr. Jardine as a violation of a rule of professional conduct, we conclude that the district court erred in determining that Mr. Jardine violated rule 1.6.

#### E. *Violations in the Loomis Matter*

¶ 65 The district court determined that Mr. Jardine violated rules 1.1 (Competence), 1.3 (Diligence), 1.4 (Communication), and 8.4(a) (Misconduct) in the Loomis Matter.

#### 1. Rule 1.3 (Diligence)

¶ 66 Rule 1.3 states that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." The district court determined that Mr. Jardine violated this rule because "[d]uring the six years that Mr. Jardine represented Mr. Loomis, Mr. Jardine's only action on the case was to file two Complaints that were ultimately dismissed." Mr. Jardine concedes he violated rule 1.3 in the Loomis Matter.

---

**31.** Mr. Jardine has not been accused of violating rule 5.3 (Responsibilities Regarding Nonlawyer Assistants).

#### 2. Rule 1.4 (Communication)

¶ 67 The district court also determined that Mr. Jardine violated rule 1.4, quoted *supra* ¶ 59. The district court's conclusion of law on this violation stated,

> Mr. Jardine failed to keep Mr. Loomis informed. From the initial meeting throughout the next six years Mr. Jardine failed to explain the nature of the civil rights litigation or how it would proceed. Mr. Jardine failed to inform Mr. Loomis of the dismissals of two Complaints. Over the course of six years, Mr. Jardine failed to return phone calls and claimed to be too busy to discuss the matter when Mr. Loomis did get to speak with him.

¶ 68 We agree with the district court that Mr. Jardine failed to communicate properly with Mr. Loomis. He did not reasonably inform Mr. Loomis about the status of the matter or comply with reasonable requests for information. We affirm the district court's conclusion that Mr. Jardine violated rule 1.4 in the Loomis Matter.

#### 3. Rule 1.1 (Competence)

¶ 69 Rule 1.1 states, "[a] lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." The comments to rule 1.1 explain how a court might determine whether a practitioner had the necessary knowledge and skill:

> In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question, the preparation and study the lawyer is able to give the matter and whether it is feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field in question. In many instances, the required proficiency is that of a general practitioner. Expertise in a particular field of law may be required in some circumstances.[32]

---

**32.** UTAH R. PROF'L CONDUCT 1.1 cmt. 1.

Furthermore, "[a] lawyer need not necessarily have special training or prior experience to handle legal problems of a type with which the lawyer is unfamiliar." [33]

¶ 70 In concluding that Mr. Jardine violated this rule, the district court wrote, Mr. Jardine told Mr. Loomis that he had a good case against the State of Utah. Based upon this representation, Mr. Loomis hired Mr. Jardine in 2002. Over the course of the next six years, Mr. Jardine twice filed Complaints in the matter but did nothing to further the causes of action. The Complaints were dismissed for failure to prosecute or failure of service. No meaningful work was done to further this civil rights case against the State of Utah.

¶ 71 In sum, the district court stated, "Mr. Jardine lacked the legal knowledge and skill for this kind of case and was not thorough or reasonably prepared for the representation." However, the district court made no findings of fact that support a conclusion that Mr. Jardine lacked the knowledge or skill for this kind of case. The district court said nothing concerning the complexity and specialized nature of the matter, Mr. Jardine's general experience or training, the preparation and study he was able to give the matter or whether it was feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field in question. Absent evidence to the contrary, this seems to us to be the sort of case that only demands "the required proficiency ... of a general practitioner." [34]

¶ 72 The district court's next point—that Mr. Jardine "was not thorough or reasonably prepared for the representation"—is likewise unsupported. We certainly agree that Mr. Jardine's representation was less than excellent, but in our view, the flaws in the representation fall entirely within the realm of rules 1.3 and 1.4. We therefore conclude that the district court erred in determining that Mr. Jardine violated rule 1.1.

#### 4. Rule 8.4(a) (Misconduct)

¶ 73 The relevant portion of rule 8.4(a) states that "[i]t is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct." As we recently noted, "we are troubled by the practice of sanctioning attorneys for violating rule 8.4(a) based solely on their violations of other rules." [35] "[I]t seems that the rule amounts to no more than a 'piling on,' in that an attorney will never be sanctioned for only one rule violation." [36] We directed the rules committee to reconsider this aspect of rule 8.4(a), and we repeat that directive here, and decline to impose any sanction based on a violation of rule 8.4(a).

### F. Violations in the Woods Matter

¶ 74 The district court determined that Mr. Jardine violated rule 8.4(d) (Misconduct) in the Woods Matter. Rule 8.4(d) provides that "[i]t is professional misconduct for a lawyer to ... engage in conduct that is prejudicial to the administration of justice." [37] This violation stemmed from a missed hearing at justice court. Mr. Jardine's secretary had improperly informed him that the jury trial had been continued, and, accordingly, neither he nor Mr. Woods appeared on the day they were expected. Because the defendant was not present, the parties could not reach a settlement. A bench warrant was issued for Mr. Woods, who was nevertheless happy to have the matter continued. The justice court judge personally sent a letter to OPC complaining that Mr. Jardine had impeded justice. The district court agreed. It found that "justice was impeded because Mr. Woods was deprived of the opportunity for a favorable plea deal and matters had to be continued." It concluded that "Mr. Jardine caused harm to his client and to the legal system. His actions were prejudicial to the administration of justice."

33. *Id.* cmt. 2.

34. *Id.* cmt. 1.

35. *In re Discipline of Brussow*, 2012 UT 53, ¶ 1 n. 1, 286 P.3d 1246.

36. *Id.*

37. Utah R. Prof'l Conduct 8.4(d).

¶ 75 In our view, rule 8.4(d) exacts a much higher standard than missing one hearing. On occasion, even the most diligent lawyer has an error in his calendar that causes him to miss a hearing. In this case, the incident is isolated and no evidence has been shown that the client was actually harmed. In fact, the opposite may be true; Mr. Woods benefitted from the continuance.

¶ 76 The comments to rule 8.4 suggest that the rule exists to curb much greater evils:

Many kinds of illegal conduct reflect adversely on fitness to practice law, such as offenses involving fraud and the offense of willful failure to file an income tax return. However, some kinds of offenses carry no such implication. Traditionally, the distinction was drawn in terms of offenses involving "moral turpitude." That concept can be construed to include offenses concerning some matters of personal morality, such as adultery and comparable offenses, that have no specific connection to fitness for the practice of law. Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty, breach of trust or serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation.[38]

¶ 77 Although we do not imply that this list is exhaustive, we conclude that Mr. Jardine's failure to appear at one hearing, which resulted in no harm to the client, did not prejudice the administration of justice. We conclude the district court erred in determining that Mr. Jardine violated rule 8.4(d) in the Woods Matter.

### G. Summary

¶ 78 In sum, we conclude that Mr. Jardine violated rule 1.5 (Fees) in the Gardner Matter; rule 1.15 (Safekeeping Property) in the Gardner and Mecham Matters; rule 1.2(a) (Scope of Representation) in the Gardner Matter; rule 1.3 (Diligence) in the Loomis Matter; rule 1.4 (Communication) in the Loomis Matter. We conclude that Mr. Jardine did not violate rule 1.5 (Fees) in the Mecham Matter; rule 1.4 (Communication) in the Gardner Matter; rule 1.6 (Confidentiality) in the Mecham Matter; rule 1.1 (Competence) in the Loomis Matter; or rule 8.4(d) (Misconduct) in the Woods Matter. We decline to consider any violation of rule 8.4(a).

## II. SANCTION

¶ 79 Having considered Mr. Jardine's misconduct, we now consider the appropriate sanction. Rule 14–604 of the Supreme Court Rules of Professional Practice offers factors that "should be considered in imposing a sanction after a finding of lawyer misconduct: (a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors." Subsections (a), (b), and (c) are unremarkable—the duties violated are clearly outlined above; we have no evidence that Mr. Jardine intended to do any ill-will; and, in every case, the potential or actual injury was minimal.[39]

¶ 80 We next consider the aggravating circumstances, as outlined by rule 14–607 of the Supreme Court Rules of Professional Practice.[40] The district court determined that the situation was exacerbated by Mr. Jardine's prior record of discipline, his substantial experience in the practice of law; the fact that there were multiple offenses, his lack of good faith effort to make restitution or to rectify the consequences of the misconduct involved, his refusal to acknowledge the wrongful nature of the misconduct involved, his dishonest or selfish motive, and the vul-

---

38. *Id.* cmt. 2.

39. We are not asked to comment on whether Mr. Jardine caused great harm to Ms. Gardner by failing to supervise her financial affairs. We are only asked whether the fee he charged was excessive, and, if so, how great the harm was.

40. No mitigating circumstances have been argued.

nerability of the victims. We agree with some of the district court's assessment. We agree, for example, that Mr. Jardine's prior record of discipline is troubling. Although we do not affirm all of the district court's rulings in this case, we do hope that any discipline imposed on a lawyer inspires that lawyer to act with the utmost fidelity to the rules of professional conduct thereafter. We agree that Mr. Jardine's seventeen years of practice is an aggravating circumstance, as is the fact that there were multiple offenses. We also agree that Ms. Gardner was a vulnerable victim, that her vulnerability made the situation worse, and that Mr. Jardine failed to take appropriate steps to rectify the situation.

¶ 81 We do not, however, find record evidence to support the district court's conclusions that Ms. Mecham and Mr. Loomis were any more vulnerable than any other consumer of legal service. Nor do we find evidence to support the conclusion that Mr. Jardine acted out of a dishonest or selfish motive. Finally, we reject the district court's conclusion that Mr. Jardine refused to acknowledge the wrongful nature of the misconduct involved in the Mecham Matter. Having concluded that Mr. Jardine's conduct on this point did not violate the Rules of Professional Conduct, we are compelled to also conclude that he cannot be faulted for failing to show remorse.

¶ 82 After weighing the gravity of the offenses, Mr. Jardine's mental state, the harm done, and the aggravating circumstances, we conclude that suspension was the appropriate sanction. However, in our view, three years was excessive. For this reason, we reduce his suspension to a period of eighteen months.

## CONCLUSION

¶ 83 We affirm the district court's conclusion that Mr. Jardine violated rule 1.5 in the Gardner Matter, rule 1.15 in the Gardner and Mecham Matters, rule 1.2(a) in the Gardner Matter, rule 1.3 in the Loomis Matter, and rule 1.4 in the Loomis Matter. We also conclude he violated rule 8.4(a) by its current terms but we give it no substantive effect. We conclude that Mr. Jardine did not violate

rule 1.5 in the Mecham Matter, rule 1.4 in the Gardner Matter, rule 1.6 in the Mecham Matter, rule 1.1 in the Loomis Matter, or rule 8.4(d) in the Woods Matter. We conclude that four aggravating factors apply: prior record of discipline, the vulnerability of Ms. Gardner, Mr. Jardine's substantial experience in the practice of law, and his lack of good faith effort to make restitution in the Gardner Matter. We conclude that the district court erred in applying any other aggravating factors. After assessing Mr. Jardine's violations and aggravating circumstances, we conclude the appropriate sanction is a suspension of eighteen months.

Associate Chief Justice NEHRING authored the opinion of the Court, in which Chief Justice DURRANT, Justice DURHAM, Justice PARRISH, and Justice LEE joined.