**2024 UT App 103**

## THE UTAH COURT OF APPEALS

BLAINE RICHMOND,
Appellant,
*v.*
JOAN BATEMAN,
Appellee.

Opinion
No. 20220123-CA
Filed July 18, 2024

Fourth District Court, Provo Department
The Honorable Robert C. Lunnen
No. 160401308

Bruce M. Pritchett, Attorney for Appellant

Michael J. Miller, Kathleen Abke, and
Scarlet R. Smith, Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1     In 2009, a probate court granted Marlene Richmond's request to be appointed guardian over her husband Jess Richmond.[1] Marlene's request was supported, in part, by a letter

---

1. Because Jess and Marlene shared the same last name, we'll refer to them by their given names throughout this opinion. We'll do the same with respect to their son Blaine, who plays a role in this case too. We mean no disrespect by the apparent informality.

        Also, the ruling in question appointed Marlene to be Jess's guardian and conservator. While there are some legal differences between the powers of a guardian and conservator, those

(continued…)

that she obtained from Dr. Lynn Bateman, Jess's longtime physician, as well as by representations made to the court at the probate hearing from John Maddox, an attorney who appeared on Jess's behalf. But as it turns out, neither Dr. Bateman nor Maddox had done their jobs: Dr. Bateman had not met with Jess for several months before writing his letter, nor had he performed any tests to determine whether Jess was cognitively impaired; for his part, Maddox had not even discussed the possibility of a guardianship with Jess during their one brief visit before the hearing. When some potential improprieties came to the court's attention, the court set aside Marlene's guardianship. In spite of this, Marlene managed to withdraw several hundred thousand dollars from Jess's bank account a short time later, after which she placed the cash in a wheelbarrow and burned it.

¶2      Jess subsequently sued both Dr. Bateman and Maddox for negligence. After Maddox settled, the district court granted Dr. Bateman's motion for summary judgment, ruling that the actions of Maddox and Marlene were both superseding causes to any negligence by Dr. Bateman. Jess has since passed away, but his estate now appeals. For the reasons set forth below, we reverse the decision granting summary judgment to Dr. Bateman.

BACKGROUND[2]

*Marlene's Guardianship over Jess*

¶3      Jess married Marlene for the first time in 1952, and the couple had six children together between 1953 and 1960. The two

---

differences are immaterial to the issues before us in this appeal. For simplicity, we'll refer to the order as a guardianship order.

2. "When reviewing a grant of summary judgment, we recite the disputed facts in a light most favorable to the nonmoving party." *Young v. Fire Ins. Exch.*, 2008 UT App 114, ¶ 19, 182 P.3d 911

(continued…)

divorced in 1996, and this divorce was full of financial contention. Their son Blaine later stated in a declaration that Marlene "removed about $250,000 from [Jess's] bank accounts" during the divorce and that Jess "had to fight for years in court to get [it] back."

¶4 After the divorce, Marlene moved to Mesquite, Nevada, and remarried. When her second husband died, Marlene moved closer to Jess. In 2008, Jess and Marlene remarried, and they kept their remarriage secret from most of their children.

¶5 Dr. Bateman was the longtime primary care physician for both Marlene and Jess. Dr. Bateman later said that he had met with Jess "on several occasions" during the "30 or more years" that he had treated him, though Jess "visit[ed] rather infrequently." In May 2009, Dr. Bateman met with Jess "for a medical condition which [he] treated at that time." At that visit, Dr. Bateman did not perform any tests or procedures to determine Jess's mental status or cognitive abilities, but he did order a brain MRI. There is no indication in the record of what "medical condition" Dr. Bateman was treating, nor is there any further information about the results of the MRI that he ordered.

¶6 In August 2009, Marlene spoke with Dr. Bateman and asked him to write a letter supporting her request to be appointed as Jess's guardian. Dr. Bateman wrote and signed a letter that read:

> To Whom It May Concern:
>
> I am the personal physician for Jess M. Richmond. Mr. Richmond is eighty (80) years old and has been my patient for over 40 years. It is my professional opinion that because of diminished mental capacity

_____

(quotation simplified). Unless otherwise noted, our recitation is drawn from facts that were deemed undisputed by the district court or for which we see no dispute in the record.

he is not able to adequately care for himself with regards to his personal needs nor to properly manage his finances. I recommend that his wife Grace Marlene Richmond be appointed as his Guardian and Conservator in his behalf.

Dr. Bateman later signed an affidavit in which he acknowledged that he wrote the August 2009 letter "[a]t the request of" Marlene "based upon her representations of [Jess's] mental condition."

¶7 Marlene then petitioned a probate court to appoint her as Jess's guardian. In response to a request from Marlene's attorney, John Maddox (also an attorney) agreed to represent Jess in the matter. Maddox read Dr. Bateman's letter and then scheduled a time to visit with Jess at the home Jess shared with Marlene. When Maddox arrived for the visit, Marlene told him that she feared that if Maddox brought up the subject of a guardianship, Jess would become angry and physically harm her. Maddox then visited with Jess on the back patio for "20 to 30 minutes or so." Maddox later said that Jess didn't ask why he was visiting and that the two discussed Jess's "life, where he was born, what kind of work he did, how many children he had and their names." Maddox concluded that if Jess "needed a guardian anyway, there was little to be gained by bringing up the subject and making him upset, leading to potential violence."

¶8 The probate court held a guardianship hearing on November 19, 2009. Maddox appeared at the hearing on behalf of Jess. Jess did not attend the guardianship hearing, though Maddox later said that the court "had sent notice of the hearing to [Jess] and as far as" Maddox knew, Jess "had received said notice." When the probate court asked Maddox where Jess was, Maddox responded, "He is at home. We are afraid that he would become disruptive and perhaps violent."

¶9 At the hearing, Marlene presented Dr. Bateman's letter. Marlene's attorney stated that "it was the suggestion of . . . [Jess's] doctor . . . that this guardianship and receivership take place." The

judge asked Maddox if he had met with Jess, to which Maddox responded that he had visited Jess at his home. When Maddox was asked what his "report" was "as to his position," Maddox responded that his "report would coincide with the doctor's letter," that he believed it was "in [his] client's best interest that [Jess] have a little help in managing his affairs," and that Maddox therefore had "no objection to a full guardianship." The probate court asked Maddox if he felt that Jess understood the purpose of a guardianship, to which Maddox responded, "Yes, I believe he understands the purpose of a guardianship. I believe he is also of a firm mind that he does not need one." After expressing some concern that Jess wasn't in court for the hearing, the probate court asked Maddox if Jess had "the mental capacity to be making an informed decision about the guardianship." Maddox responded, "I do not think he does. In this regard, there are times when he is rational, but I do not believe he would be rational in this matter."

¶10　The probate court then found that Jess was an incapacitated person and authorized Marlene to be appointed as his guardian "[b]ased on the objective evidence of the doctor filed in this case, [and] also the report of the court visitor."[3]

---

3 . A court visitor "is, with respect to guardianship and conservatorship proceedings, an officer, employee, or special appointee of the court with no personal interest in the proceedings whose role is to investigate, observe, and report to the court." Utah R. Jud. Admin. 6-507(1)(A). A lawyer may serve as a court visitor. *Id.* R. 6-507(1)(B). A court visitor is appointed in a guardianship proceeding "to conduct an inquiry into whether to waive the respondent's presence at the hearing," *id.* R. 6-507(2), and may additionally be appointed "to investigate the respondent's circumstances and well-being, including when an attorney is not appointed," *id.* R. 6-507(2)(A). Though court visitors need not be attorneys, Jess alleged in his complaint that Maddox "had an attorney-client relationship" with him, and as noted, Maddox affirmatively represented to the probate court that

(continued…)

¶11    While under the guardianship, Jess at times remained in the home he shared with Marlene, though at other times he lived with Blaine. At some point during this period, Marlene dropped Jess off at an assisted living facility "with no possessions other than a plastic Wal-Mart shopping bag with a few pairs of underwear, and he was under the belief that she had dropped him there to stay permanently, and that he was not free to go." The assisted living facility staff reinforced Jess's impression that he was not free to go until Blaine was able to pick him up. But even when Blaine had picked up Jess, the staff called the police and tried to get Jess to return to the facility. Blaine later said Jess was "terrified of being kept there against his will."

*After Marlene's Guardianship Is Set Aside, She Destroys Jess's Money*

¶12    Blaine and his brothers filed an emergency petition to remove Marlene's guardianship over Jess. In June 2010, the probate court held a hearing on the petition and learned that Marlene was not providing reports on Jess's assets. The court believed this violated her fiduciary duty as a guardian "to aggressively find out what the estate is and report to the court." Through representations from the brothers' counsel, Marlene's counsel, and Marlene herself, the court learned that after Marlene had been appointed as Jess's guardian, she had transferred title of the couple's home into a trust in her name, sold three of Jess's vehicles (two of which had been titled in his name only), and purchased a car for herself. The court also learned that Marlene now had access to some of Jess's accounts and that she had the ability to draw from them. Because of what it had learned, the probate court ordered that "nothing be done to change the status of the ownership of the home" to prevent Marlene from making any further transfers, and the judge also ordered Marlene to leave

---

he was "appearing on behalf of [Jess], the incapacitated person." From this record and this legal backdrop, we therefore understand the probate court's reference to the "court visitor" to be a reference to Maddox, and the parties' arguments to us on appeal are consistent with this understanding as well.

any cash untouched and not withdraw any cash that was still in an account, with the exception of forwarding $1,500 each month to one of Jess's sons for Jess's "benefit and care." The court then temporarily suspended Marlene's appointment as guardian, ordered her to make an accounting of any assets that she had handled, and ordered a further evaluation of Jess to determine his mental capacity.

¶13 A clinical psychologist soon conducted a neuropsychological evaluation of Jess. In his report, he noted that Jess became aware of the guardianship when "he was told he could no longer write checks at his bank." The psychologist also observed that Jess had "provided considerably more detail than might be expected of an individual who is being evaluated for dementia" and that test results showed he was "clearly not into a dementia range." The psychologist concluded that Jess showed "no signs of general cognitive or intellectual dysfunction and seem[ed] to be capable of making decisions consistent with his age and education."

¶14 In February 2011, the probate court issued an order setting aside the appointment of Marlene as Jess's guardian. In this order, the court found that Jess did "not meet the definition of an incapacitated person and [did] not need a guardian." The court ordered Marlene to "sign all documents necessary" and "to turn over" all of Jess's assets that she controlled. The court further ordered Marlene to file a final accounting with the court.

¶15 Despite this order, Marlene proceeded to withdraw "the entirety of [Jess's] funds" from his bank accounts—an amount that was well over $200,000. According to Marlene's subsequent explanation, she was able to do this because Jess had asked her to withdraw the money and give it to him. After withdrawing the money, Marlene decided that she needed to get rid of it because, in her view, the money was "destroying the family." According to an account later provided by Marlene's attorney, Marlene then took the cash home, put it in a wheelbarrow in the backyard, and

burned it. After doing so, Marlene unsuccessfully attempted suicide.

*Lawsuit and Summary Judgment*

¶16    In 2013, Jess sued Dr. Bateman for negligence, but that case was voluntarily dismissed without prejudice in 2015. Jess died in early 2015, and in 2016, his estate (acting through Blaine as the administrator) filed a complaint in district court against both Dr. Bateman and Maddox, asserting claims of negligence against both. Dr. Bateman died in 2017, so the claims against him proceeded against his widow as personal representative of his estate.[4]

¶17    In May 2018, Jess settled with Maddox and Maddox was dismissed from the case. The next month, Dr. Bateman moved for summary judgment, arguing that Jess couldn't "show that Dr. Bateman's alleged misconduct proximately caused injuries" to Jess because there were unforeseeable, intervening causes that directly caused Jess's alleged injuries. According to Dr. Bateman, the actions of Maddox and Marlene both qualified as intervening and superseding causes.[5]

---

4. For simplicity, we'll refer to "Jess" and "Dr. Bateman" as the parties for the remainder of this opinion, even though, as indicated, this second case was largely litigated by their respective estates.

5. As will be apparent from the various citations to the record and authorities in this opinion, the terms "intervening cause" and "superseding cause" are often used together (and sometimes appear to be used interchangeably). There may be some subtle or conceptual differences between the two terms, but if there are, those differences aren't relevant to the issues we decide in this opinion. For simplicity, we'll generally refer to the doctrine as the superseding cause doctrine, but we'll leave untouched references from either the record or the cases that refer to an intervening cause.

¶18 Jess opposed the motion for summary judgment. He argued that there were "key facts that create[d] genuine issues of material fact concerning proximate cause" that should be decided by a jury. In support of this opposition, Jess submitted an affidavit from Dr. Frederick Gottlieb, who is board-certified in internal medicine and was also one of Jess's treating physicians. In this affidavit, Dr. Gottlieb expressed his opinion that Dr. Bateman had "breach[ed] the standard of care" by writing the letter saying that Jess lacked mental capacity and needed a guardian without "examining [Jess] or testing him at the time." Dr. Gottlieb further observed that it was "more likely than not foreseeable that a divorced ex-wife such as Marlene, who had taken money" from Jess "before, and who came back into his life and secretly remarried him, could likely arrange to take control of his money again." According to Dr. Gottlieb, "physicians dealing with elderly patients . . . know that it is foreseeable that a family member may try to take control of an elderly person's estate—it is a known foreseeable risk that [he had] become acquainted with in [his] practice."

¶19 In August 2019, the district court denied the motion for summary judgment, ruling that the "issue of proximate cause should be sent to a jury and not decided on summary judgment." The court opined that this was a "very, very, very close call," but it ultimately concluded that a jury should "decide whether the intervening acts by Marlene or Mr. Maddox qualify as intervening causes that eliminate Dr. Bateman's liability."

¶20 In January 2021, the case was reassigned to a new judge. In August 2021, Dr. Bateman filed a motion to reconsider the summary judgment ruling that had previously been issued by the prior judge.

¶21 In January 2022, the court (through the new judge) issued a ruling granting the motion for reconsideration. In the court's view, reconsideration was warranted because "the prior decision was clearly erroneous and would result in a manifest injustice." The court then ruled that Dr. Bateman was entitled to summary

judgment because, as a matter of law, the actions of Maddox and Marlene were both superseding causes that cut off any causal connection between Dr. Bateman's conduct and Jess's injuries.

¶22 In doing so, the court first concluded that Maddox had committed "extraordinary violations of his ethical and fiduciary duties" and that Dr. Bateman "could not have reasonably foreseen" that Maddox "would violate his ethical duties to represent his client zealously and to act with candor to the probate court." From this, the court concluded that without Maddox's negligence, Marlene never would have been appointed as guardian—and, thus, that Jess never would have been harmed.

¶23 The court next ruled that Marlene's actions also constituted a superseding cause. In the court's view, "the specific mechanism of harm in this case" was "Marlene's burning of [Jess's] assets." The court then concluded that because "[n]o reasonable juror could find that Dr. Bateman could reasonably foresee that Marlene would burn [Jess's] money in a wheelbarrow," her actions constituted "an intervening and superseding cause that absolves Dr. Bateman of liability."

¶24 Based on its determination that there were two superseding causes, the court granted summary judgment to Dr. Bateman and dismissed the claims against him. And because the court was granting summary judgment on proximate cause alone, it concluded that Dr. Gottlieb's affidavit was "irrelevant" because Dr. Gottlieb's opinions only went to the question of whether Dr. Bateman had breached the standard of care, not the question of whether the "breach proximately caused injury or any issues relating to intervening cause."

## ISSUE AND STANDARD OF REVIEW

¶25 Jess appeals the district court's decision to grant summary judgment to Dr. Bateman. We review a district court's "legal conclusions and ultimate grant or denial of summary judgment

for correctness, viewing the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Swanigan v. Avenues Healthcare Inc.*, 2023 UT App 2, ¶ 10, 524 P.3d 173 (quotation simplified).

ANALYSIS

¶26    The district court ruled that the actions of Maddox and Marlene were both superseding causes that absolved Dr. Bateman of liability for negligence. Jess now challenges that ruling. For the reasons set forth below, we reverse.

A.    What's Not at Issue

¶27    Before addressing the district court's ruling, we first note a few things that are not at issue in this appeal or that we do not decide.

¶28    First, Jess has not challenged the court's decision to reconsider the earlier ruling that had denied Dr. Bateman's motion for summary judgment. As a result, our analysis is limited to the question of whether the court erred when it granted summary judgment to Dr. Bateman.

¶29    Second, in the ruling granting summary judgment to Dr. Bateman, the court did not rule on any questions relating to duty or breach; instead, its ruling was only about causation. And on that front, the court didn't rule on causation generally—i.e., it did not rule on whether Dr. Bateman's acts did or did not cause harm to Jess. Rather, the court simply ruled that there were two superseding causes that broke any causal chain that might have otherwise existed.

¶30    Third, in his arguments on appeal, Dr. Bateman advances an alternative basis for affirmance—namely, he asks us to rule that he did not violate any duty that he owed to Jess. We decline the invitation to rule on this proposed issue.

¶31    We "are mindful that we are a court of review, not of first view." *R.O.A. Gen. Inc. v. Salt Lake City Corp.*, 2022 UT App 141, ¶ 39, 525 P.3d 100 (quotation simplified). As a result, in most cases, our institutional role is best served when we review a decision from a lower court on a particular issue. That said, it is "well-established that we may affirm a judgment, order, or decree appealed from if it is sustainable on any legal ground or theory apparent on the record, even though that ground or theory was not identified by the lower court as the basis of its ruling." *Bailey v. Bayles*, 2001 UT App 34, ¶ 9, 18 P.3d 1129 (quotation simplified). But this doctrine is discretionary. And here, it's not just the case that the district court did not rule on this issue. In addition, Dr. Bateman did not even raise it below as a potential argument. Because of this, Jess did not have the opportunity below to present any contrary evidence or arguments about it. It's one thing for an appellate court to rule on an issue that was presented and argued below but was not ruled on by the district court; it's quite another for an appellate court to rule on an issue that is being presented for the first time on appeal. For reasons of both fairness and institutional competence, appellate courts are generally reluctant to do the latter, and we see no reason to depart from this norm here. We accordingly decline Dr. Bateman's invitation to affirm on the basis of a potential argument that was neither raised nor ruled on below.

¶32    Finally, as discussed below, the issue on appeal turns on the superseding cause doctrine. In *State v. Oliver*, we suggested that by "relieving the original tortfeasor of *all* liability, the superseding cause doctrine is at least arguably inconsistent with principles of comparative fault, which have been a part of Utah law since at least 1973." 2018 UT App 101, ¶ 33 n.11, 427 P.3d 495 (emphasis in original). But we also pointed to an earlier case where this court had expressed skepticism of that view, given that "on many occasions since 1973 Utah appellate courts have continued to refer to and apply" the superseding cause doctrine. *Id.* We ultimately declined to resolve this potential issue in *Oliver*, given that neither party had "mount[ed] any argument" about

whether "the superseding cause doctrine has been supplanted by Utah's comparative fault statutes." *Id.*

¶33    Here, Jess sued both Maddox and Dr. Bateman, thus potentially implicating the negligence of both. And as should also be clear from the discussion that runs throughout this opinion, there's reason to think that a jury could believe that Marlene bears some responsibility for the harm too. Although Dr. Bateman filed a notice of intent to allocate fault to Maddox below and later raised the possibility of allocating fault as an alternative basis for relief in a subsequent pleading, the district court decided the motion for summary judgment on superseding cause grounds alone without mentioning the potential fault allocation. For our purposes, what matters is that, as in *Oliver*, neither party has briefed the question of whether the superseding cause doctrine remains viable in the comparative fault world we now live in. Because of this, we again have no occasion to rule on whether this is so.

B.    Legal Framework for Proximate Cause and Superseding Cause Determinations

¶34    This leaves the question that is properly before us, which is whether the district court erred in granting summary judgment to Dr. Bateman based on the court's determinations that, as a matter of law, the actions of Maddox and Marlene both qualified as superseding causes. Before addressing the court's separate conclusions regarding Maddox and then Marlene, we first set forth the general principles that guide our analysis of both.

¶35    As noted, Jess sued Dr. Bateman for negligence based on medical malpractice. To make "a prima facie case of medical malpractice, a plaintiff must establish (1) the standard of care by which the physician's conduct is to be measured, (2) breach of that standard by the physician, (3) injury that was proximately caused by the physician's negligence, and (4) damages." *Dierl v. Birkin*, 2023 UT App 6, ¶ 17, 525 P.3d 127 (quotation simplified), *cert. denied*, 525 P.3d 1107 (Utah 2023). "A plaintiff's failure to present

evidence that, if believed by the trier of fact, would establish any one of the elements of the prima facie case justifies a grant of summary judgment to the defendant." *Id.* (quotation simplified).

¶36 The district court granted summary judgment based on the third element—proximate cause. To satisfy this element, Jess was required to show that the alleged breach, "in natural and continuous sequence (unbroken by an efficient intervening cause), produce[d] the injury" and that without it, "the result would not have occurred." *Breton v. Clyde Snow & Sessions*, 2013 UT App 65, ¶ 9, 299 P.3d 13 (quotation simplified). As indicated, the district court concluded that there were two superseding causes.

¶37 "An intervening cause, a cause that interrupts proximate causation, is an independent event, not reasonably foreseeable, that completely breaks the connection between fault and damages." *Wood v. United Parcel Service, Inc.*, 2021 UT 49, ¶ 15, 496 P.3d 139 (quotation simplified). And a "superseding cause is a magical thing: it operates to relieve the original actor from *all* liability for her original (and potentially tortious) act." *Oliver*, 2018 UT App 101, ¶ 33 (emphasis in original).

¶38 "The key words . . . are reasonably foreseeable." *Wood*, 2021 UT 49, ¶ 15 (quotation simplified). Thus, even if there is a subsequent act that also contributes to the harm, that act does not qualify as a superseding cause (i.e., it does not relieve the original actor of liability) if the actor "should have realized that a third person might so act" or if "a reasonable person . . . would not regard it as highly extraordinary that the third person had so acted." *Id.* ¶ 16 (quotation simplified). Moreover, for purposes of a superseding cause analysis, foreseeability is "not concerned" with "whether a reasonable person could anticipate a general risk of injury to others." *Dee v. Johnson*, 2012 UT App 237, ¶ 5, 286 P.3d 22 (quotation simplified). Rather, foreseeability focuses on the "specifics of the alleged tortious conduct, such as whether the specific mechanism of the harm could be foreseen." *Id.* (quotation simplified).

¶39　As indicated, the superseding cause analysis contemplates that multiple actions that occurred at different times may contribute to the same injury. But even so, our supreme court has recently clarified that "superseding causation cannot be assessed by looking to which party's negligence was closest in time" to the event in question. *Wood*, 2021 UT 49, ¶ 39. Instead, the superseding cause inquiry functions "more broadly than that," turning on whether the conduct of the subsequent actors was reasonably foreseeable. *Id.*

¶40　And this is consistent with how proximate cause works generally. After all, "there can be more than one proximate cause or, more specifically, substantial causative factor, of an injury." *McCorvey v. Utah State Dep't of Transp.*, 868 P.2d 41, 45 (Utah 1993). Several cases have thus recognized that an initial actor can be held liable for its own negligence, even if subsequent actors were negligent too. In *Mulherin v. Ingersoll-Rand Co.*, for example, the court held that there can be "concurrent proximate causes" of an injury and that the "latter fault" of one actor "should not blot out the consequences of the former, when both were concurrent causes of the accident." 628 P.2d 1301, 1303 (Utah 1981). And in *Godesky v. Provo City Corp.*, our supreme court upheld a jury verdict that assessed liability against an initially negligent actor, even though the jury found that other subsequent actors had acted negligently too. 690 P.2d 541, 543–44 (Utah 1984). The supreme court explained that an

> intervening negligent act does not automatically become a superseding cause that relieves the original actor of liability. The earlier actor is charged with the foreseeable negligent acts of others. Therefore, if the intervening negligence is foreseeable, the earlier negligent act is a concurring cause.

*Id.* at 545. In short, the application of the superseding cause doctrine turns on the foreseeability of the subsequent acts.

¶41 As indicated, the ruling at issue granted summary judgment to a defendant on the basis of the superseding cause doctrine. A "court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). When a court considers such a motion, "all facts and the reasonable inferences to be made therefrom should be construed in a light favorable to the non-moving party." *USA Power, LLC v. PacifiCorp*, 2010 UT 31, ¶ 33, 235 P.3d 749.

¶42 "Causation is a highly fact-sensitive element of any cause of action and generally cannot be resolved as a matter of law." *Breton*, 2013 UT App 65, ¶ 10 (quotation simplified); *see also Godesky*, 690 P.2d at 544 (stating that proximate causation "is generally a matter of fact to be determined by the jury"). This remains true with respect to questions of superseding cause. As indicated, the superseding cause analysis largely turns on foreseeability. But as explained by our supreme court, foreseeability "turns on a host of factors including who the person is, what they observe, their ability to remedy the condition, and the time they have to respond before the injury occurs." *Wood*, 2021 UT 49, ¶ 42. As a result, a foreseeability "inquiry is highly fact dependent." *Id.*

¶43 Even so, there are cases in which summary judgment may be appropriate on questions of causation generally or superseding cause more particularly. But such cases "rarely" occur. *Nielsen v. LeBaron*, 2023 UT App 29, ¶ 21, 527 P.3d 1133 (quotation simplified), *cert. denied*, 534 P.3d 751 (Utah 2023). And they involve situations in which "a reasonable jury could only come to one conclusion on the facts before it." *Wood*, 2021 UT 49, ¶ 13. In the superseding cause context, this would mean that the facts regarding foreseeability are "so clear that reasonable persons could not disagree." *Nielsen*, 2023 UT App 29, ¶ 21 (quotation simplified).

C.      Maddox's Actions

¶44   We first consider the district court's conclusion that Maddox's actions were a superseding cause. In the court's view, Dr. Bateman "could not have reasonably foreseen" that Maddox "would violate his ethical duties to represent his client zealously and to act with candor to the probate court." Because of this, the court held that Maddox's actions constituted a superseding cause that absolved Dr. Bateman of liability.

¶45   It's true that, as a matter of chronological sequencing, Dr. Bateman's alleged misconduct (writing the letter without first examining or testing Jess) preceded Maddox's alleged misconduct (failing to adequately discuss the matter with his client and making misrepresentations to the court). But as explained, "superseding causation cannot be assessed by looking to which party's negligence was closest in time to the" event. *Wood*, 2021 UT 49, ¶ 39. Instead, the question is whether the subsequent actions were foreseeable to the initial actor. Unlike the district court, we believe that a jury could reasonably conclude that it would have been foreseeable to Dr. Bateman that an attorney might subsequently act in this manner.

¶46   The court's ultimate ruling rested in no small part on its belief that it would not have been "reasonably foreseeable" to Dr. Bateman that "a third party" (namely an attorney) would subsequently "take action that would place his license to practice law at risk." As an aspirational matter, we certainly expect all attorneys to act in ethically appropriate ways, and we share the district court's belief that most attorneys do. But even so, we don't regard it as categorically unforeseeable that an attorney would act unethically. We've previously recognized that, as to persons generally, even "criminal conduct" might, "under the circumstances, [be] reasonably foreseeable." *Steffensen v. Smith's Mgmt. Corp.*, 820 P.2d 482, 488 (Utah Ct. App. 1991), *aff'd*, 862 P.2d 1342 (Utah 1993). And as lamentable as it may be to acknowledge, attorneys sometimes do act unethically or even criminally. The Utah Bar Journal publishes a monthly report summarizing recent

attorney disciplinary actions. The Utah Office of Professional Conduct (the organization charged with investigating attorney misconduct) has compiled a document that contains those summaries since 1988, and that document currently comes in at 559 pages.[6] Also, there are any number of reported appellate cases involving Utah attorneys who acted unethically or even criminally—sometimes for lack of diligence and sometimes for personal gain. *See, e.g.*, *In re Steffensen*, 2021 UT 1, 481 P.3d 468; *In re Barrett*, 2017 UT 10, 391 P.3d 1031; *In re Lundgren*, 2015 UT 58, 355 P.3d 984; *In re Corey*, 2012 UT 21, 274 P.3d 972; *In re Grimes*, 2012 UT 87, 297 P.3d 564; *In re Jardine*, 2012 UT 67, 289 P.3d 516; *In re Johnson*, 2001 UT 110, 48 P.3d 881; *In re Tanner*, 960 P.2d 399 (Utah 1998); *In re Babilis*, 951 P.2d 207 (Utah 1997).[7]

¶47    The point here is illustrative, not particular. After all, Dr. Bateman wasn't a lawyer, and we suspect that he was not studiously reading the Utah Bar Journal or Utah's appellate cases. But even so, incidents such as these unfortunately keep happening, and they certainly seep into the public's consciousness. Thus, unlike the district court, we don't regard it as being so difficult to imagine an attorney taking "action that would place his license to practice law at risk" that Maddox's conduct must be deemed unforeseeable as a matter of law.

¶48    This leads to our second point, which functions on more of a case-specific level. As noted, the foreseeability "inquiry is highly

---

6 . *Lawyer Public Discipline*, Office of Professional Conduct, https://www.opcutah.org/wp-content/uploads/2024/01/Attorney _Public_Disciplin_OPC_Master_Jan_24.pdf [https://perma.cc/4Y 9Z-X2L9].

7. This string cite provides just a short sampling. And this is hardly a new phenomenon. *See, e.g.*, *In re Platz*, 132 P. 390, 391 (Utah 1913) (affirming the disbarment of an attorney for unspecified acts that, in the supreme court's view, made him "morally an unfit, unsafe, and improper person" to be entrusted "with the powers of an attorney at law").

fact dependent," *Wood*, 2021 UT 49, ¶ 42, so a jury may find, on the facts of a particular case, that a particular harm was foreseeable. And since the case arises in the context of a summary judgment motion, "all facts and the reasonable inferences to be made therefrom should be construed in a light favorable to the non-moving party." *USA Power*, 2010 UT 31, ¶ 33.

¶49   The record here provides a basis from which a jury could find that Dr. Bateman could have foreseen the possibility of conduct like Maddox's. Again, Dr. Bateman was the primary care physician for Jess, who was his elderly patient. During the litigation below, Jess submitted an affidavit from Dr. Gottlieb in which Dr. Gottlieb observed that "physicians dealing with elderly patients . . . know that it is foreseeable that a family member may try to take control of an elderly patient's estate" and that this "is a known foreseeable risk."[8]

¶50   The circumstances at issue here would have supported just such a suspicion. After all, Dr. Bateman was the longtime physician of both Marlene and Jess, so it's reasonable to infer from this record that he would have known about their complicated marital history. In any event, it's undisputed that Dr. Bateman wrote the August 2009 letter "[a]t the request of" Marlene and "based upon her representations of [Jess's] mental condition." Since Dr. Bateman knew that Marlene was asking him (a doctor) to sign off on a guardianship request for her husband even though Dr. Bateman had not conducted an independent examination to confirm her representations about Jess's mental state, Dr. Bateman would have reason to think that she might make a

---

8. The district court thought that Dr. Gottlieb's affidavit was "irrelevant" to the question of superseding cause, given that Dr. Gottlieb's conclusions were couched in terms of the standard of care. We disagree with the court's conclusion that this affidavit has no bearing here. Dr. Gottlieb observed that this particular risk is known to doctors who treat elderly patients, which would have direct bearing on whether it was foreseeable and is the very question at issue in this appeal.

similar request of others who might also be involved in the process—which would include, of course, an attorney.

¶51   To be clear: we're not holding that, as a matter of law, Dr. Bateman did foresee this. Rather, what we're saying is that, given (i) the general dynamics in play (one spouse attempting to obtain a guardianship over the other, with the result being that the spouse would obtain control over the other's finances), (ii) the more particular dynamics of this case (the spouse asking the doctor to sign off on this request without even examining the other spouse, this doctor's longstanding relationship with both spouses, and the couple's complicated marital history), and (iii) the known societal phenomena of both elder fraud and attorney misconduct, a jury *could* reasonably conclude that it was foreseeable to Dr. Bateman that, if he signed a letter supporting a guardianship without doing his due diligence, an attorney might do something similar too.

¶52   So viewed, we don't regard this as the kind of case for which "a reasonable jury could only come to one conclusion on the facts before it." *Wood*, 2021 UT 49, ¶ 13. Because of this, the district court erred in concluding that, as a matter of law, Maddox's misconduct qualified as a superseding cause.

D.     Marlene's Actions

¶53   The district court also ruled that Marlene's actions qualified as "an intervening and superseding cause that absolves Dr. Bateman of liability." This was so because, in the court's view, her "violation of court orders and burning [Jess's] money in a wheelbarrow [were] not reasonably foreseeable to Dr. Bateman." For many of the same reasons set forth above, we reverse this ruling too.

¶54   Although Marlene's conduct was certainly unethical and very likely illegal, a jury could still think that it was foreseeable under the circumstances. *See Steffensen*, 820 P.2d at 488 (recognizing that even "criminal conduct" might, "under the

circumstances, [be] reasonably foreseeable"). And again, the circumstances at issue here were that Marlene was asking Dr. Bateman to tell a court that Jess, Dr. Bateman's elderly patient, was mentally infirm and needed her to be appointed as his guardian, even though Dr. Bateman had conducted no testing or consultations to confirm this. Dr. Gottlieb opined that "physicians dealing with elderly patients . . . know that it is foreseeable that a family member may try to take control of an elderly person's estate—it is a known foreseeable risk that [he had] become acquainted with in [his] practice." In these circumstances, a jury could find that it would have been foreseeable to Dr. Bateman that any failure to verify the statements he made might assist Marlene in improperly obtaining control over Jess's assets and misusing them.

¶55 In holding otherwise, the district court focused on what it perceived to be the "mechanism of harm in this case—that is, Marlene's burning of [Jess's] assets." Focusing in on this specific action, the court expressed its view that "[n]o reasonable juror could find that Dr. Bateman could reasonably foresee that Marlene would burn [Jess's] money in a wheelbarrow."

¶56 The court's general consideration of the "mechanism of harm" was appropriate. In a series of cases, our courts have indeed discussed the mechanism of harm as it relates to the foreseeability analysis. But read in their proper context, those cases don't support the level of specificity that the district court employed here.

¶57 As explained by our supreme court, the general framework is this:

> Some variation of the notion of foreseeability is a factor in three of four elements of a tort: duty, breach, and proximate cause. Yet the terminology is confusing, as the term has different connotations as to each of the different tort elements to which it is applied. An essential difference among the elements

> is that duty is a question of law determined on a categorical basis, while breach and proximate cause are questions for the fact finder determined on a case-specific basis. This means that foreseeability in duty analysis is evaluated at a broad, categorical level. In duty analysis, foreseeability does not question the specifics of the alleged tortious conduct such as the specific mechanism of the harm.

*B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 25, 275 P.3d 228 (quotation simplified). Other Utah decisions have reinforced and applied this same framework. In *Mower v. Baird*, for example, our supreme court held that at the duty stage, foreseeability looks to "the general relationship between the alleged tortfeasor and the victim and the general foreseeability of harm," while at the breach or causation stages, the focus is on "the specifics of the alleged tortious conduct such as the specific mechanism of the harm." 2018 UT 29, ¶ 24, 422 P.3d 837 (quotation simplified); *see also Davis v. Wal-Mart Stores Inc.*, 2022 UT App 87, ¶ 18, 514 P.3d 1209, *cert. denied*, 529 P.3d 827 (Utah 2022).

¶58　The particular facts at issue in *Jeffs* help illustrate how this distinction works in practice. There, a nurse practitioner had prescribed "at least six medications" to her patient. *Jeffs*, 2012 UT 11, ¶ 2. "[W]ith all of these drugs in his system," the patient shot and killed his wife, and he later pleaded guilty to aggravated murder. *Id.* The patient's children subsequently filed a civil suit against the nurse practitioner and others who were involved in the patient's medical care. *Id.* ¶ 3. That suit "alleged negligence in the prescription of the medications that caused [the patient's] violent outburst and his wife's death." *Id.* The district court dismissed the suit, concluding that the nurse practitioner owed no duty to the children. *Id.* ¶ 4. The supreme court reversed, stating that for purposes of a duty analysis, the foreseeability inquiry would look to whether the "likelihood of *some type of harm* [was] sufficiently high that a reasonable person could anticipate a *general risk of injury* to others." *Id.* ¶ 27 (emphases added). By contrast, the supreme court held that for purposes of "a breach or

proximate cause argument," the question would be whether, "in this specific case," there was reason to think that the "drug interactions and psychological considerations at stake would lead a reasonable physician to take additional precautions because she could foresee that [the patient] *might become violent or dangerous*," which the court saw as the "specific mechanism of injury" in that case. *Id.* ¶ 26 (emphasis added).

¶59 Turning back to this case, the district court below believed that, for purpose of the causation analysis, the "specific mechanism of injury" was the act of burning Jess's money in a wheelbarrow. From this, the court concluded that this specific mechanism was not foreseeable. But this focus was simply too narrow, and if this level of specificity were required, it could lead to an endpoint in which appropriately actionable harms might never be deemed foreseeable. If a machine's manufacturer negligently installed a widget, for example, a jury wouldn't need to think it foreseeable that the widget might dislodge and strike an unlucky worker in the right eye, as opposed to the forehead or the throat or the chest. It would be enough for the jury to think it foreseeable that the widget might dislodge and strike a worker, thereby producing an injury.

¶60 In this sense, we think it noteworthy that in *Jeffs*, the supreme court referred to the "specific mechanism of injury" as being the possibility that the patient "might become violent or dangerous" as a result of the negligently prescribed medications. *Id*. The court didn't go further, however, such as by holding that the plaintiffs were required to show that it was foreseeable that the patient would become violent and harm his wife with a gun—i.e., the court didn't hold that the nurse practitioner would have been absolved of liability if the patient had hurt some other individual instead, nor did the court hold that the nurse practitioner would have been absolved of liability if the patient had hurt his wife with a knife or some other weapon instead of a gun. Rather, the framework that the court used contemplated that, for purposes of duty, the question turned on the foreseeability of "some type of harm" or of "a general risk of injury to others," *id.*

¶ 27, while for purposes of breach or causation, the question turned on the foreseeability that the patient "might become violent or dangerous," *id.* ¶ 26.

¶61     Applied here, the duty question would thus turn on whether it was foreseeable to Dr. Bateman that if Marlene were improperly appointed as Jess's guardian, Jess might suffer "some type of harm." Then, for purposes of breach or causation, the appropriate question would be whether it was foreseeable that Jess might be harmed in the particular way that he was harmed here: by Marlene misappropriating his assets. We thus disagree with the court's conclusion that it must have also been foreseeable exactly what Marlene would do with those assets. Put differently, whether Marlene burned Jess's money in a wheelbarrow, spent his life savings on lottery tickets, or gave his cars and other property away to strangers, Jess would still have been injured by the specific mechanism of Marlene improperly accessing and then misusing his assets. For these purposes, that would have been enough.

¶62     So viewed, and for the reasons set forth above, we conclude that a jury could reasonably think it was foreseeable that if Marlene were improperly appointed as Jess's guardian, she would access and misuse Jess's money. As a result, we disagree with the court's conclusion that, as a matter of law, Marlene's actions were a superseding cause that absolved Dr. Bateman of liability.

CONCLUSION

¶63     We disagree with the district court's conclusion that, as a matter of law, the actions of both Maddox and Marlene qualified as superseding causes. We therefore reverse the grant of summary judgment and remand for further proceedings consistent with this opinion.

———————